UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JANICE STAPLES, o/b/o C.L.S., a minor child,

Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

Defendant.

CASE NO. C04-5747FDB

REPORT AND RECOMMENDATION

Noted for December 30, 2005

Plaintiff, C.L.S., a minor, has, through her mother, Janice Staples, brought this matter for judicial review of the denial of her application for supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is eleven years old.[1] Tr. 25. She has no past work experience. Tr. 22. Plaintiff, through her mother, protectively filed an application for SSI benefits on March 13, 2002, alleging disability

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

as of February 1, 2001, due to learning disabilities. Tr. 14, 25, 47, 49, 57. Her application was denied initially and on reconsideration. Tr. 25-27, 32. Plaintiff requested a hearing, which was held on October 29, 2003, before an administrative law judge ("ALJ"). Tr. 205. At the hearing, plaintiff, represented by counsel, appeared, but did not testify. Tr. 205-219. Plaintiff's mother appeared as well, and testified on behalf of plaintiff. Id.

On January 29, 2004, the ALJ issued a decision determining plaintiff to be not disabled, finding in relevant part as follows:

(1) at step one of the disability evaluation process for determining eligibility for SSI benefits for a minor, plaintiff had never performed substantial gainful activity;

(2) at step two of that process, plaintiff had "severe" impairments consisting of communication disabilities, a psychotic disorder, not otherwise specified, and posttraumatic stress disorder ("PTSD"); and

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, nor were they functionally equivalent in severity to any impairments listed therein.

Tr. 22-23. Plaintiff's request for review was denied by the Appeals Council on September 8, 2004, making the ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R. § 416.1481.

On November 8, 2004, plaintiff filed a complaint in this court seeking judicial review of the ALJ's decision. (Dkt. #1, #2 and #3). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a) the ALJ failed to make a reasonable effort to obtain a case evaluation based on the record in its entirety;

(b) the ALJ erred in evaluating the medical evidence in the record regarding her precocious puberty;

(c) the ALJ failed to properly credit the opinion of plaintiff's treating psychiatrist;

(d) the ALJ failed to properly assess plaintiff's standardized test results regarding her speech and language impairments; and

(e) the ALJ erred in finding plaintiff's PTSD did not meet 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, § 112.06.

The undersigned agrees that the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that this matter be remanded to the Commissioner for further administrative proceedings.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I. Sequential Evaluation Process for Determining a Minor Claimant's Eligibility for SSI Benefits

For a claimant who is under the age of 18, the Commissioner will consider that claimant disabled if he or she has "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. To be disabled, therefore, the impairment or combination of impairments must be medically determinable, that is they "must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.927(a)(1).

Notwithstanding the presence of a medically determinable impairment, however, if the claimant is engaging in "substantial gainful activity," he or she will not be found disabled. 20 C.F.R. §§ 416.906, 416.924(a). At step one of the sequential evaluation process, therefore, the Commissioner must determine whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If the claimant is not engaging in such activity, the Commissioner then moves on to step two of the evaluation process. 20 C.F.R. § 416.924(a).

At step two of that process, the Commissioner must consider whether the claimant has a "severe" impairment. 20 C.F.R. § 416.924(a), (c). An impairment is not severe if it is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). If the impairment is severe, then, at step three, the Commissioner must determine whether it "meets, medically equals, or functionally equals" any impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (the "Listings"). 20 C.F.R. § 416.924(a), (d). If the claimant has such an impairment, and it "meets the duration requirement" noted above, disability will be found. 20 C.F.R. § 416.924(a).

In determining whether a minor claimant is disabled, the Commissioner will consider "all of the relevant evidence" in the record, including information from medical and other sources, such as therapists, parents, teachers and other people the claimant knows. 20 C.F.R. § 416.924a(a). The Commissioner thus "will not consider any single piece of evidence in isolation" or "rely on test scores alone." 20 C.F.R. § 416.924a(a)(1)(ii). In evaluating the ability to function, the Commissioner looks at whether the claimant can do the activities other children the claimant's age can do, how well the claimant does those activities, and how much help is needed from family, teachers or others. 20 C.F.R. § 416.924a(b)(2)(i).

II. The ALJ Failed to Make a Reasonable Effort to Obtain a Case Evaluation Based on the Record in Its Entirety

Section 1382c(a)(3)(I) of the Social Security Act provides in relevant part:

> In making any determination under this title . . . with respect to the disability of an individual who has not attained the age of 18 years . . ., the Commissioner of Social Security *shall make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability of the individual* (as determined by the Commissioner of Social Security) evaluates the case of such individual.

Howard on behalf of Wolff v. Barnhart, 341 F.3d 1006, 1013 (9th Cir. 2003) (emphasis in original). In Howard, the ALJ failed to obtain such an evaluation, relying instead only on "the individual evaluations and reports of each separate specialist, which pertained to each of their individual specialities." Id. at 1014. As such, the ALJ had "made no effort" to evaluate the claimant's case "in its entirety." Id. Under section 1382(a)(3)(I), however, the ALJ must "make a reasonable effort to obtain a case evaluation, based on the record in its entirety, from a pediatrician or other appropriate specialist, rather than simply constructing his own case evaluation form the evidence in the record."[2] Id. The ALJ's failure to do so required a remand for further administrative proceedings, even though substantial evidence in the record supported the ALJ's finding of non-disability. Id. at 1014-15.

Plaintiff argues that in this case the ALJ also erred in failing to obtain a case evaluation based on the

---

[2] In Howard, "[t]he district court found that the ALJ did not err in failing to obtain a case evaluation from a qualified expert because the record was replete with reports from expert physicians who had examined" the claimant. Id. The Ninth Circuit noted the "distinction, however, between having an expert evaluate a claimant with respect to that expert's particular specialty, and having an expert evaluate a claimant's case in its entirety, considering all of the medical records and determining whether those indicate that the claimant is disabled within the meaning of the Social Security Act." Id.

record in its entirety. The undersigned agrees. Defendant argues plaintiff did not request that the ALJ obtain a medical expert evaluation. Section 1382(a)(3)(I), however, does not require the claimant to make such a request, nor does Howard read such a requirement into that statutory provision. Defendant further argues that the ALJ was not obligated to call a medical expert, because qualified experts, such as Dr. Coral Hilby, a non-examining consulting physician, already had reviewed the entire medical record.

As pointed out by plaintiff though, much of the medical and other evidence in the record post-dates the report provided by Dr. Hilby. Tr. 148, 157, 164, 168, 176, 180, 183-86, 187, 190, 192-93, 195, 197-200. In addition, while Dr. Daniel Lam, plaintiff's treating psychiatrist, did perform an evaluation of her (which seems at least in part to have been based on a review of reports from medical and other sources) subsequent to that provided by Dr. Hilby (Tr. 157-59), this evaluation too is not the most recent report in the record. Nor does it appear that Dr. Lam was making a determination as to whether or not those medical and other sources he relied on indicated plaintiff was disabled within the meaning of the Social Security Act. See id.; Howard, 341 F.3d at 1014 n.2. As such, the undersigned finds the ALJ failed to obtain the proper case evaluation, and, on that basis alone, this matter should be remanded to the Commissioner for further administrative proceedings. Howard, 341 F.3d at 1014-15.

III. The ALJ Did Not Err in Evaluating the Medical Evidence in the Record Regarding Plaintiff's Precocious Puberty

Plaintiff argues the ALJ failed to consider whether her diagnosed condition of precocious puberty was severe at step two of the disability evaluation process, and whether that condition met, equaled, or was functionally equivalent to Listing 109.02B.3 (precocious puberty). An impairment is "severe" if it is more than a slight abnormality or combination of slight abnormalities causing no more than minimal functional limitations. 20 C.F.R. § 416.924(c). In this case, the medical evidence in the record fails to show plaintiff suffered from precocious puberty, which caused more than minimal functional limitations. Accordingly, the ALJ did not err in failing to find that condition to be a severe impairment or that it met, equaled, or was functionally equivalent to Listing 109.02B.3.

In early October 2002, plaintiff was seen by Dr. Daniel Lam for a psychiatric evaluation. Dr. Lam commented that plaintiff was "large for her stated age" and seemed "to be undergoing precocious puberty." Tr. 158. He further commented that she demonstrated "poor boundaries, sitting very close to her therapist during the interview and requiring a lot of redirection in this area." Id. Dr. Lam recommended that plaintiff

"establish with a primary care physician," who could "assess her precocious puberty." Tr. 159. However, Dr. Lam did not actually diagnose her with that condition, nor did he find she suffered from any particular mental or physical limitations because of that condition. See id. The only other medical evidence in the record regarding plaintiff's alleged precocious puberty, furthermore, is a physical examination report from Dr. Megan Baker and an x-ray to determine bone age, both obtained in early February 2003. While those documents do show plaintiff had "[i]ncreased skeletal maturity compared to chronological age" (Tr. 171-72, 175), again, no indication of more than minimal functional limitations is shown.[3]

IV. The ALJ Failed to Properly Credit the Opinion of Plaintiff's Treating Psychiatrist

Plaintiff argues the ALJ improperly disregarded the opinion of Dr. Lam. The undersigned agrees. The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, therefore, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a

---

[3]Because plaintiff failed to establish her precocious puberty was a severe impairment, the ALJ was not required to proceed to step three of the sequential evaluation process to determine whether that impairment met, equaled or was functionally equivalent to any impairment in the Listings. 20 C.F.R. § 416.924(a), (c). There also is no indication in the record that plaintiff's precocious puberty, in combination with her other impairments, significantly limited her functioning. 20 C.F.R. § 416.924a(b)(4).

treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

In early October 2002, Dr. Lam conducted a psychiatric evaluation of plaintiff. With respect to that evaluation, the ALJ found as follows:

> [O]n October 7, 2002, the record documents the claimant presented to Daniel Lam, M.D., a child and adolescent psychiatrist, for a consultative mental status evaluation (Exhibit 4F, Pgs. 48-50). During this examination, the claimant's parent reported that the child [was] experiencing intrusive thoughts and nightmares regarding both the death of her cousin and the shooting [she had witnessed]. The claimant's parent also related concern that the child had been reporting visions of a "boogie man." The claimant was reported to have described seeing this individual both in dreams and during waking hours. The claimant denied experience of auditory hallucinations. On examination, the claimant's mood was described as nervous, anxious and frightened. Her affective responses were reported to range widely from bright to anxious to somewhat unusual and incongruent to content. The claimant's speech was described as being clear. Her thought processes were noted to show some disorganization. The record of this examination includes [the] observation of Dr. Lam that the claimant appeared very suggestible and endorsed multiple symptoms when asked about them. She is noted to have endorsed themes of being afraid of the "boogie man" and themes of being sad about the death of her cousin. As previously noted herein, she endorsed seeing the "boogie man" both during sleep and waking hours. The claimant is noted to have also endorsed having times when she felt like her mind was being read. There was not evident [sic] by examination any homicidal/suicidal ideation. With respect to cognitive processes, the claimant was noted [to be] alert and oriented. She was reported to experience difficulty with concentration. In terms of memory, the claimant was noted [to be] able to register 3 of 3 items immediately and 2 of the 3 after a five minute interval. The claimant's overall level of intellectual functioning was informally assessed

> as falling beneath the average range on [the] basis of language and vocabulary skills. However, this was thought possibly an underestimate given concentration difficulties and cognitive disorganization demonstrated during this examination. On [the] basis of this examination, the record documents the claimant was provided the following diagnostic impression: Psychotic disorder, not otherwise specified; and posttraumatic stress disorder (PTSD). The claimant was assigned a global assessment of functioning (GAF)[4] of 40. A GAF of 40 would indicate some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. In terms of prospective care, the claimant was provided pharmaceutical management consisting of a prescription for Paxil. This score is considered extremely low given the objective testing results and the relative normal level of activity and functioning by the claimant. In her initial intake at this facility on August 19, 2002, she was evaluated and provided details similar to those discussed above. At that time she was given a (GAF) of 55 and diagnosed not with a psychosis but Bereavement. The lower GAF and diagnosis of Psychosis appears to be based entirely on the subjective claims of visions and nightmares. Given the level of her suggestibility noted above and the absence of these symptoms when outside her mother's house, and the earlier intake assessment, these events seem less a psychotic disorder and more her bereavement and imagination as noted by her counselor (Exhibit F6, pgs. 58, 60).

Tr. 17.

Plaintiff argues that in rejecting the CGAS score assessed by Dr. Lam, the ALJ failed to explain what the "objective testing results" he noted were, and that he substituted his own opinion for that of Dr. Lam. The undersigned agrees. The ALJ did not state which objective testing results contradicted the finding of Dr. Lam regarding plaintiff's CGAS score. Even assuming the ALJ here was referring to the mental status examination findings obtained by Dr. Lam, those findings, while not entirely negative, are not completely inconsistent with such a CGAS score of 40. See Tr. 158.

The ALJ, furthermore, may not substitute his own lay opinion for the findings and opinion of the claimant's psychiatrist. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987); McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978). This, however, appears to be exactly what the ALJ did in stating that given the level of plaintiff's "suggestibility" and "the absence of these symptoms [i.e., her visions and nightmares] when outside her mother's house, and the earlier intake assessment [in late August

---

[4] As the parties have pointed out, the ALJ erroneously referred to plaintiff's assigned children's global assessment scale ("CGAS") score as her GAF score. The CGAS apparently was adapted from the GAF scale, which is used for adults, as a tool for rating the general level of functioning for children. See Plaintiff's Opening Brief, p. 12 and attachment thereto; Defendant's Reply Brief, pp. 10-11. A GAF score of 40 appears to indicate, as the ALJ stated, the presence of "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood" (Tr. 17, see also, http://www.depts,washington.edu/washinst/Training/CGAS/GAF%20Index.htm), whereas a CGAS score of 40 denotes in relevant part a "[m]ajor impairment in functioning in several areas and *unable to function in one of these areas*" (Plaintiff's Opening Brief, p. 12 and attachment thereto (emphasis added by plaintiff)).

2002], these events seem less a psychotic disorder and more her bereavement and imagination as noted by her counselor." Tr. 17 (emphasis added). As such, the ALJ erred.

The ALJ also erred in adopting the higher CGAS score of 55 assessed by plaintiff's mental health therapist, Heather Beatte, M.A., at the initial intake evaluation in late August 2002, over that provided by Dr. Lam in early October 2002. As a therapist, Ms. Beatte is not an "acceptable medical source," and thus her opinion is entitled to less weight than that of Dr. Lam, a treating psychiatrist. See Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996) ("acceptable medical sources" include licensed physicians); 20 C.F.R. § 416.913(a), (d). In addition, at the time of termination of mental health services that had been provided by Ms. Beatte in early February 2003, plaintiff was assessed with a GAF score of 40 (Tr. 177), the same score that had been assessed by Dr. Lam in early October 2002.

The undersigned further notes that Dr. Lam is a child and adolescent psychiatrist. As a specialist in this area, his opinion is given greater deference regarding plaintiff's mental health issues than those who are not specialists in that area. See Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(5)). There is no indication in the record that Ms. Beatte, or any of the other mental health providers in the record who have evaluated or treated plaintiff or reviewed the medical evidence in the record are such specialists. Accordingly, the ALJ was required to give greater deference to Dr. Lam's findings for this reason as well.

Finally, the ALJ discounted Dr. Lam's diagnoses in part because they appeared to be based entirely on plaintiff's subjective claims. See Tonapetyan, 242 F.3d at 1149 (ALJ may disregard opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility); Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999) (opinion premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where those complaints have been properly discounted). Objective clinical and laboratory data, however, may consist of diagnoses and observations of professionals trained in psychopathology. Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (opinion based on clinical observations supporting diagnosis of depression is competent evidence). The undersigned thus also does not find this to be a reasonable basis for rejecting Dr. Lam's findings.

V. Step Three of the Sequential Evaluation Process

At step three of the sequential evaluation process, the ALJ is required to evaluate the claimant's impairment or impairments to see if they meet, medically equal, or are functionally equivalent to any of those listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R §§ 416.924(a). The Listings consist of two parts: "Part A," which "contains medical criteria that apply to adult persons age 18 and over," and "Part B," which "contains additional medical criteria that apply only to the evaluation of impairments of persons under age 18." 20 C.F.R. § 416.925(b).

To determine whether a minor claimant has an impairment or impairments that meet any of those contained in the Listings, therefore, Part B is used first. Id. If the medical criteria in Part B do not apply, then the medical criteria in Part A are used. Id. With respect to Part B, "'listing-level severity' generally means . . . 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." Id. Six such "domains" are considered in determining listing-level severity, which are as follows: "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for" oneself; "and (vi) [h]ealth and physical well-being." 20 C.F.R. § 416.926a(b)(1).

A claimant's impairment or impairments are deemed "medically equivalent" to an impairment in the Listings, "if the medical findings are at least equal in severity and duration" to the listed impairment. 20 C.F.R. § 416.926(a). In making this determination, the Commissioner compares "the symptoms, signs, and laboratory findings" about the claimant's impairment or impairments with "the corresponding medical criteria" for the listed impairment or impairments. Id. If the claimant's impairment or impairments are not described in the Listings, the Commissioner compares the medical evidence in the record with the criteria "for closely analogous listed impairments" to see if that evidence is "at least of equal medical significance to" the listed criteria. 20 C.F.R. § 416.926(a)(2). Medical equivalence, however, must be based only on the medical evidence in the record, which must "be supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.926(b).

If a claimant's impairment or impairments do not meet or medically equal any of those contained in the Listings, the Commissioner then determines whether his or her impairment or impairments functionally equal the Listings. 20 C.F.R. § 416.926a(a). To functionally equal the Listings, the claimant's impairment or impairments "must be of listing-level severity," i.e., they must result either in marked limitations in two

domains or an extreme limitation in one domain. Id. In considering whether the claimant's impairment or impairments are functionally equivalent to the Listings, the Commissioner assesses what the claimant is unable to do, has difficulty doing, needs help doing, or is restricted from doing. Id. The Commissioner also "will assess the interactive and cumulative effects" of all of the claimant's impairments. Id.

The Commissioner will find a "marked" limitation in a domain if the claimant's impairment or impairments interfere "seriously" with the claimant's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation also means "a limitation that is 'more than moderate' but 'less than extreme.'" Id. Further, marked limitation will be found when the claimant has "a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning" in the particular domain, and the claimant's "day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(d)(2)(iii).

The Commissioner will find an "extreme" limitation in a domain if the claimant's impairment or impairments interfere "very seriously" with the claimant's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation also is one that is "more than marked." Id. As with a marked limitation, an extreme limitation additionally will be found if the claimant has "a valid score that is three standard deviations or more below the mean on a standardized test designed to measure ability or functioning" in the particular domain, and the claimant's "day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(iii).

In determining whether a claimant has a marked or extreme limitation, the Commissioner "will not rely on any test score alone." 20 C.F.R. § 416.926(e)(4)(i). That is, "[n]o single piece of information taken in isolation" will establish that the claimant has a marked or extreme limitation in a domain. Id. Instead, the Commissioner will consider the claimant's "test scores together with" other information concerning the claimant, such as classroom performance and the observation of others. 20 C.F.R. § 416.926(e)(4)(ii). The Commissioner thus may find there is no marked or extreme limitation, even if the claimant's test scores are at the requisite level, if other information in the record shows that the claimant's "functioning in day-to-day activities is not seriously or very seriously limited." 20 C.F.R. § 416.926(e)(4)(ii)(B).

## VI. The ALJ Did Not Fail to Properly Assess Plaintiff's Standardized Test Results

Plaintiff argues the ALJ erred by failing to find her language impairments were equal in severity to those in the Listings, based on her standardized test scores and the testimony of her teachers and therapists. The undersigned disagrees. In late January 2002, plaintiff was administered an "Assessing Semantic Skills through Everyday Themes (ASSET)" test. Tr. 133. Plaintiff obtained a standard deviation score of "-2.87" in the category "ID Categories" and of "-2.93" in the category of "ID Attributes" on that test. Id. She asserts these scores show that she had "marked" limitations in the domain categories of "interacting and relating to others" and "acquiring and using information." Plaintiff's Opening Brief, p. 10. Nowhere in the record, however, is there any indication that the categories of "ID Categories" and "ID Attributes" are the equivalent of the above two, or any of the other, domains set forth in the Commissioner's regulations. As such, the ALJ did not err in his consideration of these test results. Tr. 16.

Plaintiff further asserts that her marked limitations in these areas are supported by the many specific deficiencies reported by her mother, teacher and speech therapist. That evidence, however, does not clearly show that plaintiff is markedly limited in either of these areas. With respect to the domain of "interacting and relating with others," the Commissioner considers how well the claimant can "initiate and sustain emotional connections with others, develop and use the language of" his or her "community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). With respect to "acquiring and using information," the Commissioner considers how well the claimant can acquire and learn information and use the information the claimant has learned. 20 C.F.R. § 416.926a(g).

The medical and other evidence in the record regarding plaintiff's ability to interact and relate to others largely supports the ALJ's finding of "no evidence of limitation" in this domain. Tr. 20. In early October 2002, Dr. Lam noted that plaintiff demonstrated "poor boundaries." Tr. 158. Plaintiff's mother, however, reported that she had been "functioning well" until the summer of 2002, and that there had been "no major behavioral difficulties preceding her current difficulties." Tr. 157, 159. In late December 2002, furthermore, and again in mid-January 2003, Dr. Lam noted that plaintiff was "pleasant and cooperative," and that she had good eye contact and impulse control. Tr. 184, 187.

During an initial intake evaluation conducted by Ms. Beatte in late August 2003, plaintiff was noted to be "well-behaved," "friendly and easy to engage." Tr. 165. She interacted appropriately with her mother

and maintained appropriate eye contact with Ms. Beatte. Id. Her mother reported that plaintiff was "'very nice and friendly,'" had "a few friends," and was "helpful at home" and did what her mother told her to do. Tr. 166. She was assessed with a CGAS score of 55 "because of variable difficulty in functioning so that most people would not notice the difficulty." Tr. 167. In early October 2002, however, Ms. Beatte reported that she "showed inappropriate boundaries" toward her, and in early December 2002, plaintiff's teacher told Ms. Beatte that within the past month, plaintiff's behavior had changed in that she bothered her peers and was "'loud and silly.'" Tr. 190, 197.

Plaintiff's teacher further stated, however, that plaintiff had friends, and that she hung out with children who were "at her 'level,'" although she was observed to be "'bossy'" toward her peers "at times." Id. The record also contains plaintiff's school records, in which she was noted to frequently work and play cooperatively with others, follow rules, accept responsibility for her actions, respond well to suggestions, and show consideration and respect. Tr. 138. Plaintiff's teacher reported that she was "a joy to know and teach" and that she was "a pleasure to have in class." Tr. 141. Her teacher further reported she was "very well behaved," worked "well with other students" and was "well liked." Tr. 142. During formal testing conducted in late January 2002, she "easily interacted with the examiner by participating in conversation," "initiated topics, shared information and answered questions." Tr. 133. Therefore, while the record does indicate plaintiff did have some behavior issues at times, those issues for the most part did not impair her ability to interact and relate to others as found by the ALJ.

In terms of plaintiff's ability to acquire and use information, the evidence in the record also largely supports the ALJ's determination that she was "less than markedly limited" in this area. Tr. 19. In early October 2002, Dr. Lam estimated plaintiff's intelligence to be "below average" in the areas of "language and vocabulary." Tr. 158. He ruled out "mental retardation versus borderline intellectual functioning." Tr. 159. In mid-November 2002, Dr. Lam found her thought processes to be "generally goal directed" and "a bit less disorganized" than the last time he saw her, although she had "difficulty registering information" given to her verbally. Tr. 193. Her thought processes continued to be goal directed in December 2002, and January 2003, as well. Tr. 184, 187.

At plaintiff's initial intake evaluation in mid-August 2002, her mother reported that she enjoyed mathematics at school, and Ms. Beatte reported that except for speech and language services, she did "well

in school." Tr. 166-67. In late November 2002, Ms. Beatte found her thought processes to be disorganized and she had "much difficulty" following what was said. Tr. 192. In terms of academics, in early December 2002, plaintiff's teacher told Ms. Beatte that she too had difficulty at times understanding what plaintiff said, that her comprehension was "poor," that she was "below grade level in language arts," but "average to low average" in mathematics, and that she got "'some extra help in reading.'" tr. 190.

Plaintiff's school records from early December 2001, indicate that plaintiff had "difficulty" in tasks involving vocabulary identification and use, and that she was "below grade level" in reading and writing. Tr. 134. Those records further indicate that plaintiff struggled with attention in large group activities. Id. During formal testing completed in late January 2002, it was noted that "at times" plaintiff's "referents were unclear" and she had "'gaps'" in her information. Tr. 133. Her "delay in language skills" were found to have impacted "her ability to understand verbal instructions, multi-step tasks, classroom routines and other language-based routines." Id. Those deficits also were noted to have impaired plaintiff's "ability to acquire the skills needed for reading and written language." Id.

Nevertheless, plaintiff was noted to have made "wonderful progress" in writing in April 2001, and to have demonstrated "good" skills in reading, writing and mathematics in June 2001. Tr. 142. She further was found to have made "good" progress in these areas during the 2002-2003 school year (Tr. 141), and "slow" to "adequate" progress in the area of language in late January 2003 (Tr. 108). Therefore, while the record certainly shows plaintiff has demonstrated problems in her ability to acquire and use information, particularly in the area of language skills, the evidence does not clearly indicate that they rose to the level of a "marked" limitation. Accordingly, given the evidence in the record noted above, the ALJ did not err in finding her to be less than markedly limited in this domain.

VII. The ALJ Did Not Err in Finding Plaintiff's PTSD Did Not Meet Listing 112.06

Plaintiff argues that based on the CGAS score of 40 assessed by Dr. Lam, the ALJ should have found she met the criteria of Listing 112.06. The undersigned disagrees. Listing 112.06 concerns anxiety disorders in claimants under the age of 18. Under that listing, "[t]he required level of severity for these disorders is met" when the criteria in both A and B below are satisfied:

> A. Medically documented findings of at least one of the following:
>
> 1. Excessive anxiety manifested when the child is separated, or separation is threatened, from a parent or parent surrogate; or

> 2. Excessive and persistent avoidance of strangers; or
>
> 3. Persistent unrealistic or excessive anxiety and worry (apprehensive expectation), accompanied by motor tension, autonomic hyperactivity, or vigilance and scanning; or
>
> 4. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
>
> 5. Recurrent severe panic attacks, manifested by a sudden unpredictable onset of intense apprehension, fear, or terror, often with a sense of impending doom, occurring on the average of at least once a week; or
>
> 6. Recurrent obsessions or compulsions which are a source of marked distress; or
>
> 7. Recurrent and intrusive recollections of a traumatic experience, including dreams, which are a source of marked distress;
>
> And
>
> B. For . . . children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.06. Listing 112.02B2 reads in relevant part:

> For children (age 3 to attainment of age 18), resulting in at least two of the following:
>
> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or
>
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
>
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
>
> d. Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.02B2.

Plaintiff asserts that a CGAS score of 40 denotes "major functioning in several areas and *unable to function in one of these areas*." Plaintiff's Opening Brief, p. 12 and attachment thereto (emphasis added by plaintiff). Although a CGAS score of 40 may denote such an impairment in functioning, the score itself does not indicate which specific functional areas are impaired. Further, as discussed above, although Dr.

Lam's findings indicate plaintiff has some mental health problems, it is far from clear that those findings establish that she is disabled or even has a "marked" impairment in any of the domains set forth in the Commissioner's regulations. Nevertheless, because, also as discussed above, the ALJ erred in failing to obtain a case evaluation based on the entire case record and in evaluating Dr. Lam's early October 2002 opinion, the Commissioner, on remand, shall re-determine whether plaintiff's mental impairments meet, equal or are functionally equivalent to those in Listing 12.06B.[5]

VIII. This Matter Should Be Remanded for Further Administrative Proceedings

The court may remand a case "either for additional evidence and findings or to award benefits." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues remain with respect to whether or not plaintiff is disabled, it is appropriate to remand this matter for further administrative proceedings in accordance with the findings contained herein.

CONCLUSION

Based on the foregoing discussion, the court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **December 30,**

---

[5]Plaintiff also asserts in her reply brief that the ALJ failed to properly assess her language/learning impairments under Listing 111.09. Plaintiff's Reply Brief, p. 4. However, because that issue was not properly raised in plaintiff's opening brief, the undersigned declines to address it here.

**2005**, as noted in the caption.

DATED this 5th day of December, 2005.

Karen L. Strombom
United States Magistrate Judge